**UNITED STATES of America,**
**Plaintiff,**

**v.**

**STATE TAX COMMISSION OF the**
**STATE OF MISSISSIPPI et al.,**
**Defendants.**

**Civ. A. No. 4554.**

United States District Court,
S. D. Mississippi,
Jackson Division.

March 24, 1972.

Robert E. Hauberg, U. S. Atty., Jackson, Miss., for plaintiff.

Guy N. Rogers, Asst. Atty. Gen., Taylor Carlisle, James E. Williams, State Tax Commission, Jackson, Miss., for defendants.

Before CLARK, Circuit Judge, RUSSELL,˙ Chief District Judge, and COX, District Judge.

CLARK, Circuit Judge:

This court must harmonize the constitutional grant of power, on the one hand, to Congress to make rules for the government and regulation of the Armed Services and to legislate with regard to lands purchased for military bases with the prohibition on power, on the other hand, contained in the XXI Amendment, to transport or import intoxicating liquors into a state for delivery *or use therein* in violation of state law. Since both the affirmative and negative provisos are parts of the supreme law of the land, the relative status of the two sovereigns involved in this collision of claimed authority becomes immaterial. Rather, we must reconcile the power granted with the power prohibited. Reduced to its simplest terms, our ultimate holding is that the general article I, § 8 and article IV, § 3, clause 2 grants to the Congress of legislative and regulatory powers are diminished by the express prohibition of the XXI Amendment as to all packaged liquor transactions which (1) are made on exclusively federal enclaves but without restriction upon use and consumption of such liquors outside the base, or (2) take place on military installations over which the state and federal government exercise concurrent jurisdiction.

The United States filed this action seeking declaratory and injunctive relief against enforcement of a statewide regulation requiring distillers and suppliers of alcoholic beverages to collect, over and above the purchase price, a percentage sum designated as a wholesale mark-up on their liquor sales to certain military organizations located on bases in the State of Mississippi. In addition, the United States sought to recover the total of all such payments made by these military purchasers. Jurisdiction of the action is founded on 28 U.S.C.A. §§ 1345 and 2281. The matter comes on for disposition on cross motions for summary judgment based upon interrogatories and answers and a stipulation of facts.

The State of Mississippi ceded and the United States acquired exclusive jurisdiction over lands within the state comprising Keesler Air Force Base and the United States Naval Construction Battalion Center. Mississippi also ceded and the United States accepted concurrent jurisdiction over lands comprising the Columbus Air Force Base and Meridian Naval Air Station. On the premises of each of these military installations authorized personnel operate clubs, post exchanges, package stores and other similar facilities which sell packaged liquors to classes of persons delineated by military directive. These alcoholic beverages are obtained directly from distillers and suppliers located outside the State of Mississippi who ship such goods into such bases. Not only is no contention made that the consumption or use of such beverages is restricted to the military installations where purchased,

but the proof shows further that: numerous classes of non military persons are authorized to make purchases; and every selling facility exacts a promise from each purchaser that he will obey the laws of the state as to such of the liquor bought as may be taken off of the installation. All of these military post facilities are operated with funds derived from dues and profits and none depends upon funds appropriated by the government of the United States.

Prior to July 1, 1966, the laws of the State of Mississippi wholly prohibited the sale or possession of alcoholic beverages in that state. On that date Mississippi enacted a local option alcoholic beverage control law. Miss.Code Ann. § 10265–01 et seq. (1942). This enactment imposed regulatory control over the sale of alcoholic beverages within the state in such a manner as to require all liquor purchases to be made through a state-owned warehouse. The law vested the administration of its provisions in the Alcohol Beverage Control Division of the Mississippi State Tax Commission.

This ABC Division promulgated a regulation, numbered 22 (now renumbered 30), which provides that installations selling alcoholic beverages on military reservations are to be exempted from state taxes and are given an option to order alcoholic beverages direct from the distiller, in lieu of their right under the law to make purchases from the state warehouse, but providing that in the event of the exercise of such option the direct selling distiller should collect and remit to the state the same wholesale mark-up on whiskey of 17% and on wine of 20% as charged by the state-owned warehouse.

Subsequent to the promulgation of this regulation, all distillers and suppliers of alcoholic beverages to facilities on the Mississippi bases named above collected the wholesale mark-up specified by the regulation and remitted these collections to the ABC Division of the State Tax Commission.

The plaintiff asserts that Mississippi's regulation unconstitutionally interferes with the federal procurement policy authorized by Congress and embodied in an implementing Department of Defense directive. It takes the position that Congress has conferred upon the Secretary of Defense the power to regulate the purchase, sale and use of intoxicating liquors at or near military installations by the enactment of 50 U.S.C.A. App. § 473 which provides:

> The Secretary of Defense is authorized to make such regulations as he may deem to be appropriate governing the sale, consumption, possession of or traffic in beer, wine, or any other intoxicating liquors to or by members of the Armed Forces or the National Security Training Corps at or near any camp, station, post, or other place primarily occupied by members of the Armed Forces or the National Security Training Corps.

and that the Secretary of Defense implemented this authorization by issuing Department of Defense directive 1330.15, (32 C.F.R. § 261.1–261.5). That directive establishes department policy governing the purchase, as well as the sale, of alcoholic beverages by all components of the Armed Services through on-base outlets. Under the heading "General Policy Statements," the directive contains a subdivision entitled "Cooperation," composed of the following paragraphs:

> 1. [The Department of Defense] will cooperate with all duly constituted regulatory officials (local, state and Federal) to the degree that the duties of such officials are related to the furtherance of the terms of this Directive. However, the purchase of all alcoholic beverages for resale at any camp, post, station, base or other place primarily occupied by members of the Armed Forces within the United States shall be in such a manner and under such conditions as shall obtain for the Government the most advantageous contract,

price and other factors considered, *without regard to prices locally established by state statute or otherwise.*

2. This policy of cooperation is not to be construed or represented as an admission of any legal obligation to submit to state control. (Emphasis supplied).

On June 9, 1966, the directive was amended by deleting the italicized words in ¶ 1.

The defendants make the following contentions. Payment of the wholesale mark-up required by the ABC regulation does not unduly burden the military function. Since mark-ups were passed on to customers and no assignment has been obtained from these customers to the United States, no damage claim can be maintained by it. Congress, in enacting § 473, did not intend to confer upon the Department of Defense the right to create regulations for the *purchase* of packaged liquor contrary to state law, but rather intended only to authorize liquor sales and use regulation at or near bases. The 1966 amendment to the Department of Defense directive was intended to clarify the state's right to control prices. The federal government should not have the status of a sovereign to sell liquor since such sales are not a function of sovereignty. All federal interests were acquired at times when Mississippi law forbade the sale or possession of whiskey, and Mississippi's present regulatory statutes are merely different forms of this prohibitory enactment and still apply on all federal enclaves as to purchases by the type of organizations involved here, which operate with non-appropriated funds.

In reasoning our decision, we shall assume, without deciding, that the legislative powers vested in Congress by article I, § 8, clauses 14 & 17 and article IV, § 3, clause 2 have been exercised, through delegation to the Department of Defense, in language broad enough to preempt all state control of liquor sales prices. This assumption focuses our at-

tention on whether the XXI Amendment forbids the exercise of this congressional power in such a manner as to authorize the sales involved in the case at bar to be consummated contrary to state law.

The procedure we are required to follow has been defined by the Supreme Court. Our analysis must give full play to each of the constitutional provisos "in the light of the other and in the context of the issues and interests at stake". Hostetter v. Idlewild Bon Voyage Liquor Corp., 377 U.S. 324, 84 S.Ct. 1293, 12 L. Ed.2d 350 (1964).

The pertinent parts of article I, § 8 of The Constitution provide that the Congress shall have power to make rules for the government and regulation of the land and naval forces and to exercise exclusive legislative authority over all territories purchased with the consent of a state for an armed forces base. Section 2 of the XXI Amendment is posed in these sparse and exact words: "The transportation or importation into any state . . . of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited." It is undisputed that the law of the State of Mississippi authorizes the wholesale mark-up exactions on the liquor sales involved. We are therefore required to determine if the XXI Amendment applies, i. e. did the purchases to which the mark-up was added involve transportation of liquor into Mississippi for delivery or use therein?

We will first consider the status of such transactions by the clubs and exchanges located on Keesler Field and on the Naval CB Base. These two military establishments are enclaves over which exclusive jurisdiction has been ceded by Mississippi and accepted by the United States. These lands are to Mississippi as the territory of one of her sister states or a foreign land. They constitute federal islands which no longer constitute any part of Mississippi nor function under its control. The importation of property onto these bases for use

thereon would clearly be outside the ambit of the XXI Amendment. Collins v. Yosemite Park Co., 304 U.S. 518, 58 S. Ct. 1009, 82 L.Ed. 1502 (1938); Johnson v. Yellow Cab Co., 321 U.S. 383, 64 S.Ct. 622, 88 L.Ed. 814 (1944). For example, in the Yosemite Park case the Supreme Court opined that while the XXI Amendment had increased the state's power to deal with intoxicating liquors, it did not increase the state's jurisdiction. The court stated:

> As territorial jurisdiction over the Park was in the United States, the State could not legislate for the area merely on account of the XXI Amendment. There was no transportation into California 'for delivery or use therein.' The delivery and use is in the Park, and under a distinct sovereignty. Where exclusive jurisdiction is in the United States, without power in the State to regulate alcoholic beverages, the XXI Amendment is not applicable.

In the case before us now however, the transportation of liquor to these bases was not solely for delivery and use on the military installations. The undisputed facts show that it was acquired for the purpose of being sold to individuals for their use and consumption either on the base or in the surrounding state. *Cf.* Johnson v. Yellow Cab Co., *supra,* 321 U.S. at 386, 64 S.Ct. 622. The mere fact that the sales transactions took place on the military installation does not serve to insulate the club's right to purchase from the prohibition of the XXI Amendment. That Amendment replaced unworkable nationwide prohibition under the XVIII Amendment with a form of local option prohibition or control. The effect of allowing a club to import liquor into a federal enclave and sell it there for use in the surrounding state would be identical to the effect of allowing a club to establish a package liquor store in a civilian shopping center near the military station. Both such liquor sales schemes would be subject to state law.

A fortiori, the liquor sales made on the two bases over which the federal and state governments exercise concurrent jurisdiction—Meridian and Columbus—are similarly subject to Mississippi law. Lands which are ceded and accepted with concurrent jurisdiction reserved to the state do not become federal enclaves within the state. Contrary to the situation that exists where exclusive federal jurisdiction cessions are made, such concurrently governed lands remain a part of state territory, subject only to the unblemished authority vested in the federal government to carry out the exclusively federal functions for which the areas were acquired. This reasoning finds firm support in the simultaneously decided milk regulation cases of Pacific Coast Dairy v. Dept. of Agriculture of California, 318 U.S. 285, 63 S.Ct. 628, 87 L.Ed. 761 (1943), and Penn Dairies v. Milk Control Commission of Pennsylvania, 318 U.S. 261, 63 S.Ct. 617, 87 L.Ed. 748 (1943). In *Penn Dairies* the Court held a state milk control commission could fix milk prices for contracts made within an Army encampment that was under the state's concurrent jurisdiction, even though the milk purchased was for military use. The *Pacific Coast Dairy* decision reached just the opposite result —no right of state price control—because the contracts there were made and the milk sales transactions occurred on an enclave exclusively regulated by the federal government. Except for the concurrent and exclusive jurisdictional features of the bases involved, the facts in these cases were identical. Thus, as to the concurrent jurisdiction bases, the liquor sales transactions occurred within the jurisdiction of the State of Mississippi, even where the consumption or other use of the liquor was consummated within the territorial confines of the base.

We do not attempt to say that Congress holds less than exclusive legislative authority over a military base ceded and accepted on a concurrent jurisdictional grant. Article I, § 8, clause

17, as interpreted by Paul v. United States, 371 U.S. 245, 263, 83 S.Ct. 426, 9 L.Ed.2d 292 (1943), Penn Dairies v. Milk Control Commission, *supra* and Pacific Coast Dairy v. Dept. of Agriculture, *supra*, make that right clear. No assertion of power by a state can detract from the federal government's single undivided constitutional power over such a composite federal-state area, except in the instance of the state's constitutional prerogative to enact binding legislation concerning liquor delivered to and used on such a base. This exception obtains, not by dint of state power alone, but rather because the Constitution itself has been amended to make it so. It is the power which flows through the XXI Amendment to operate on the facts in the case at bar that serves to distinguish this case from the milk regulations involved in *Paul* and *Pacific Coast Dairy*.

██ It is now well-established that while the XXI Amendment does not abrogate the commerce clause, it does limit the ambit of the power of the United States thereunder to the extent of forbidding it to use the commerce clause as a justification for importing intoxicating liquor into a state for delivery and use therein in violation of the laws of the state. State Board of Equalization v. Young's Market Co., 299 U.S. 59, 57 S.Ct. 77, 81 L.Ed. 38 (1936); Ziffrin, Inc. v. Reeves, 308 U.S. 132, 60 S.Ct. 163, 84 L.Ed. 128 (1939); Carter v. Commonwealth of Virginia, 321 U.S. 131, 64 S.Ct. 464, 88 L.Ed. 605 (1944). While we recognize that the Amendment operates only as a prohibition on power to violate state legislation which regulates intrastate use and distribution and does not serve to extend the laws of the state to reach conduct beyond its borders, United States v. Frankfort Distilleries, 324 U.S. 293, 65 S.Ct. 661, 89 L. Ed. 951 (1945), the case here involves an assertion of federal power which, in and of itself, violates the Amendment. This cannot be permitted for it would render impossible any harmonious interpretation of the constitutional document as a whole. Hostetter v. Idlewild Bon Voyage Liquor Corp., *supra*, and Joseph E. Segram & Sons, Inc. v. Hostetter, 384 U.S. 35, 86 S.Ct. 1254, 16 L.Ed.2d 366 (1966). *Cf.* Barnett v. Bowles, 151 F.2d 77 (Emergency Ct.App.1945); Dowling Bros. Distilling Co. v. United States, 153 F.2d 353 (6th Cir. 1946). In *Barnett* the court approved the imposition of pricing controls on unlawful liquor sales within the State of Mississippi at a time when the laws of the state totally prohibited commerce in such a commodity. The court, however, was careful to point out "The Emergency Price Control Act does not authorize or purport to authorize the sale or transportation or importation for delivery or use of intoxicating liquors into any state in violation of state laws. We find here no conflict in the operation of state and national regulation of intoxicating liquors."

Our decision that the XXI Amendment makes Mississippi law applicable to these transactions makes it unnecessary for us to decide such matters as whether the ambit of the enabling statute will support the Department of Defense regulations, the meaning of the 1966 amendment to those regulations, whether the method of payment followed by the clubs and exchanges here amounted to unrecoverable voluntary payments, the effect of Mississippi's enactment of its ABC law on the prior cessions to the federal government, the effect of the non-appropriated fund status of these organizations, or whether an assignment of right by individual purchasers or club members to the United States would be a prerequisite to the maintenance of this action. Since our opinion is placed on a basis relating solely to territorial jurisdiction it is also unnecessary to analyse the respective federal and State interests at stake in operating clubs and post exchanges vis-a-vis highway safety and other civilian community problems.

The defendants are entitled to summary judgment on all issues.

COX, District Judge (specially concurring).

I share the views so well expressed by Judge Clark in the opinion in chief in the captioned case, but feel impelled to inject my thoughts on some principles additionally involved and of controlling effect in this case. A voluntary payment may not be recovered in any suit at law as a universal principle of American jurisprudence. A mere protest is not sufficient to change that principle. Where the payer is not in custody, or his property is not seized, or potentially capable of being seized by a payee, and no principle of coercion or duress exists, a payment is voluntary and cannot be recovered even though the payer protests the payment, and even though the payer knows the facts and actually believes that he owes the payee nothing.

## VOLUNTARY PAYMENT

A voluntary payment by a person not then a debtor may not be recovered back. There is no evidence in this record before the Court to show aught but that these payments of these overriding percentages on liquor and wine were made by these clubs to get these alcoholic beverages without sales tax as authorized by 4 U.S.C.A. § 105 and at a specially reduced rate on wine. This is not a claim for a refund of a payment made under any kind of fraud or duress of person or property, but such payment in each instance was made initially to secure the sale and delivery of these alcoholic beverages from the manufacturer upon such payment to it of the markup price in another state.

As to such a payment, Richfield Oil Corporation v. United States, (9CA) 248 F.2d 217, 223 says: "The mere fact that payment was made under express protest, is not sufficient to prevent the payment from being a voluntary one which cannot be recovered back. As stated in Pure Oil Co. v. Tucker, 8 Cir., 164 F.2d 945, 947: 'It is a universally recognized rule that money voluntarily paid under a claim of right to the payment, and with knowledge of the facts by the person making the payment, cannot be recovered back on the ground that the claim was illegal, or that there was no liability to pay in the first instance. This is true even though the payor makes the payment * * * under protest * * *.'"

Likewise, in United States v. Eastport Steamship Corporation, (2CA) 255 F.2d 795 it is said that in the absence of fraud or duress or mistake of fact, or a reservation agreement, that a party cannot pay a claim and later sue to recover the amount paid, but that the doctrine is applicable only when the recovery is sought of a sum previously paid. See Cooperative Refinery Association v. Consumers Public Power District, 8 Cir., 190 F.2d 852; Strimling v. Stone, 8 Cir., 193 F.2d 990; Bowles v. J. J. Schmitt & Co., 2 Cir., 170 F.2d 617.

In Mississippi a party cannot recover money voluntarily paid with a full knowledge of all of the facts, although no obligation to make such payment existed. Hope v. Evans, Smedes & Marshall Chancery (1843) 195.

As a general rule, a voluntary payment with full knowledge of the facts cannot be recovered. Town of Wesson v. Collins, 72 Miss. 844, 18 So. 360; McLean v. Love, 172 Miss. 168, 157 So. 361. That rule applies as well in equity as to law. O. C. Tiffany & Co. v. Johnson & Robinson, 27 Miss. 227. Payment is voluntary where there is no duress or necessity of making payment to free person or property from legal restraint. Schmittler v. Sunflower County, 156 Miss. 227, 125 So. 534, Suggestion of Error overruled 126 So. 39. The Court in *Schmittler* said: "A payment is voluntary in the sense that no action lies to recover back the amount, not only where it is made willingly and without objection; but in all cases where there is no compulsion or duress nor any necessity of making the payment as a means of freeing the person or property from legal restraint or a grasp of legal process."

In Security Nat. Bank of Watertown, S. D. v. Young, County Treasurer, et al,

(8CA) 55 F.2d 616, 619, certiorari denied 286 U.S. 551, 52 S.Ct. 502, 76 L.Ed. 1287, provides: "True, it is alleged that the taxes were paid under protest, but this is not sufficient to save the payment from being voluntary in the sense which bars a recovery of the taxes paid, if it was not made under any duress, compulsion, or threats, or under the pressure of process immediately available for the forcible collection of the tax. Union Pac. Railroad Co. v. Dodge County Commissioners, 98 U.S. 541, 25 L.Ed. 196; Gaar, Scott & Co. v. Shannon, 223 U.S. 468, 32 S.Ct. 236, 56 L.Ed. 510; United States v. New York & Cuba Mail S. S. Co., 200 U.S. 488, 26 S.Ct. 327, 50 L.Ed. 569; Chesebrough v. United States, 192 U.S. 253, 24 S.Ct. 262, 48 L.Ed. 432."

In Dennehy v. McNulta, (7CCA) 86 F. 825, the Court said the goods were legitimate subjects of trade and there was no illegality in the nature of the character of purchase. On the contrary, his purchase, so far as appears, was in exact compliance with both his expectations and his bargain. The Court said: "There can be no recovery of money so paid, for the reason that no actual duress is shown, and no element exists to make the payment involuntary or compulsory." Radich v. Hutchins, 95 U.S. 210, 213, 24 L.Ed. 409; Lonergan v. Buford, 148 U.S. 581, 13 S.Ct. 684, 37 L. Ed. 569. In *Radich*, the Court said: " 'To constitute the coercion or duress which will be regarded as sufficient to make a payment involuntary, * * * there must be some actual or threatened exercise of power possessed, or believed to be possessed, by the party exacting or receiving payment, over the person or property of another, from which the latter has no other means of immediate relief than by making the payment. As stated by the court of appeals of Maryland, the doctrine established by the authorities is that "a payment is not to be regarded as compulsory, unless made to emancipate the person or property from an actual and existing duress imposed upon it by the party to whom the money is paid." Mayor, etc., v. Lefferman, 4

Gill, 425; Brumagim v. Tillinghast, 18 Cal. 265; Mays v. Cincinnati, 1 Ohio St. 268.' In the case at bar neither the persons nor the property of the purchasers were within the physical control of the sellers when the contracts of purchase were entered into, or when the payments were made thereupon, and in the eye of the law the transactions were voluntary."

In Putnam Tool Company v. United States, 147 F.Supp. 746, 137 Ct.Cl. 183, certiorari denied 355 U.S. 825, 78 S.Ct. 33, 2 L.Ed.2d 39 provides: "We think that the plaintiff's payment to the government was a voluntary payment, in the legal sense, and that it cannot recover a part of it in this suit. * * * One cannot, in the absence of fraud or duress or mistake of fact or reservation agreement, or, perhaps, other special circumstances, pay a claim and later sue to recover the amount paid. The plaintiff alleges, as we have said, that there was compulsion upon it which caused it to pay the claim." The compulsion involved was interest on a large indebtedness. The court said that "the fact that interest will or may accrue upon a claim, if it is not paid, is not legal duress which will make its payment recoverable."

In United States v. Eastport Steamship Corporation, (2CA) 255 F.2d 795 provides: "Under the doctrine of voluntary payment 'One cannot, in the absence of fraud or duress or mistake of fact or reservation agreement, or, perhaps, other special circumstances, pay a claim and later sue to recover the amount paid.' The doctrine is applicable only when recovery is sought of a sum previously paid. McKnight v. United States, 1878, 98 U.S. 179, 25 L.Ed. 115, affords an excellent illustration. In that case the Government had paid a sum of money to the assignees of a contractor to whom the Government was indebted. Subsequently, relying upon the undisputed invalidity of the assignment, the Government sought to recover the amount paid. Recovery was denied on the ground of voluntary payment."

In Little v. Bowers, Comptroller, 134 U.S. 547, 10 S.Ct. 620, 621, 33 L.Ed. 1016: "In Wabaunsee Co. v. Walker, 8 Kan. 431, cited with approval in Lamborn v. County Commissioners, 97 U.S. 181, 24 L.Ed. 926 and also in Union Pac. Railroad Co. v. Commissioners, 98 U.S. 541, 543, 25 L.Ed. 196, it was said: 'Where a party pays an illegal demand with a full knowledge of all the facts which render such demand illegal, without an immediate and urgent necessity therefor, or unless to release his person or property from detention, or to prevent an immediate seizure of his person or property, such payment must be deemed to be voluntary, and cannot be recovered back. And the fact that the party, at the time of making the payment files a written protest, does not make the payment involuntary.'"

In United States v. William Edmonston, 181 U.S. 500, 21 S.Ct. 718, 722, 45 L.Ed. 971 provides: " 'This is not a case of an order or direction for the payment of these moneys, given to Mr. Van Buren by the officers of the Treasury or State Department; nor is it a case where the failure to pay the moneys might be regarded as disobedience to the peremptory order of a superior officer; nor a payment under duress. The facts show nothing but a voluntary payment of money to the government, without claim of any right to retain one penny of it.' It is clear from these references that this court has distinctly and constantly recognized the doctrine that where there has been a voluntary payment of money, using that term in its customary legal sense, the money so paid cannot be recovered, and also that that doctrine applies to cases in which one of the parties is the government, and that money thus voluntarily paid to the government cannot be recovered."

In United States v. New York & Cuba Mail Steamship Co., 200 U.S. 488, 26 S. Ct. 327, 329, 50 L.Ed. 569, "And, expressing the principle to be applied, the court said, in the Chesebrough Case, [192 U.S. 253, 24 S.Ct. 262, 48 L.Ed. 432], 'even a protest or notice will not avail if the payment be made voluntarily, with full knowledge of all the circumstances, and without any coercion by the actual or threatened exercise of power possessed, or supposed to be possessed, by the party exacting or receiving the payment, over the person or property of the party making the payment, from which the latter has no other means of immediate relief than such payment.'" * * * "It is stated in Union P. R. Co. v. Dodge County, 98 U.S. 541, 25 L.Ed. 196, and quoted from that case in Little v. Bowers, 134 U.S. at page 554, 10 S.Ct.R. at page 621, and 33 L.Ed. at page 1019, as follows: 'Where a party pays an illegal demand, with a full knowledge of all the facts which render such demand illegal, without an immediate and urgent necessity therefor, or unless to release his person or property from detention, or to prevent an immediate seizure of his person or property, such payment must be deemed voluntary, and cannot be recovered back.'"

## THE UNITED STATES IS NOT A PREFERRED LITIGANT

The funds sought to be recovered belong to the members of service clubs on United States bases in Mississippi. None of it was derived, or made possible by any appropriation of public money. The United States by statute has the right to sue therefor just as would the club itself, but it has no preferential advantage as a litigant over the real party in interest. The Supreme Court of the United States many years ago said that the United States as a litigant appears in its own court with the same rights and the same responsibilities as the humblest litigant.

In Lacy v. United States, (5CA) 216 F.2d 223, 225 says: "The Government when applying for relief in a court of equity is as much bound to do equity as is a private litigant. United States v. Belt, D.C., 47 F.Supp. 239, vacated 319 U.S. 521, 63 S.Ct. 1278, 87 L.Ed. 1559, affirmed 79 U.S.App.D.C. 87, 142 F.2d

761; United States v. Detroit Timber & Lumber Co., 200 U.S. 321, 338, 26 S.Ct. 282, 50 L.Ed. 499; Daniell v. Sherrill, Fla., 48 So.2d 736, 737, 23 L.R.A.2d 1410. 'When the United States comes into Court to assert a claim it so far takes the position of a private suitor as to agree by implication that justice may be done with regard to the subject matter.' Luckenbach S. S. Co. Inc. v. The Thekla, 266 U.S. 328, 339, 340, 45 S.Ct. 112, 113, 69 L.Ed. 313."

In United States v. Maryland Casualty Company, (5CA) 235 F.2d 50, 53 says: "Beseeching the Court on equitable terms for leave to intervene, the Government is and ought to be treated as would be any other suitor, for ' * * * when government invokes the aid of the court as a litigant it stands as any other litigant * * *', Jones v. Watts, 5 Cir., 142 F.2d 575, 577, 163 A.L.R. 240, certiorari denied 323 U.S. 787, 65 S.Ct. 310, 89 L.Ed. 628; In re Minot Auto Co., 8 Cir., 298 F. 853, 857."

In Guaranty Trust Co. of New York v. United States, 304 U.S. 126, 58 S.Ct. 785, 82 L.Ed. 1224 says: "Even the domestic sovereign by joining in suit accepts whatever liabilities the court may decide to be a reasonable incident of that act. Luckenbach S. S. Co. Inc. v. The Thekla, 266 U.S. 328, 340, 341, 45 S.Ct. 112, 113, 69 L.Ed. 313; United States v. Stinson, 197 U.S. 200, 205, 25 S.Ct. 426, 49 L.Ed. 724; The Davis, 10 Wall. 15, 19 L.Ed. 875; The Siren, 7 Wall. 152, 159, 19 L.Ed. 129. As in the case of the domestic sovereign in like situation, those rules, which must be assumed to be founded on principles of justice applicable to individuals, are to be relaxed only in response to some persuasive demand of public policy generated by the nature of the suitor or of the claim which it asserts."

91 C.J.S. United States § 183, p. 420 teaches: "The rights of the United States are ordinarily measured by the same rules as those of a private litigant."

## THIS IS NOT A SUIT FOR A DEBT OWING TO THE UNITED STATES

This is a suit which the United States has a right to bring as a sovereign under the circumstances, but it is not the real party in interest in such funds, and if recovered, will not be covered into the general fund of the United States Treasury. Not one dime of this money ever came from public revenue.

Although the United States has the right to sue the employer under the wage and hour law to recover back wages due according to the act, it cannot be said that the debt is one due the United States within the meaning of 31 U.S.C.A. § 191 and, therefore, entitled to priority under the bankrupt act. Nathanson v. National Labor Relations Board, 344 U.S. 25, 73 S.Ct. 80, 82, 97 L.Ed. 23 the Court said: "It does not follow that because the Board is an agency of the United States, any debt owed it is a debt owing the United States within the meaning of R.S. § 3466." The Court further said: "There is no function here of assuring the public revenue. The beneficiaries of the claims are private persons as was the receiver in American Surety Co. v. Akron Savings Bank, 212 U.S. 557, 29 S.Ct. 686, 53 L.Ed. 651."

## THESE CLUBS WERE ACTUALLY SUBJECT TO THE STATE SALES TAX

But they procured an exemption from the state sale tax on hard liquor and wine and mixed drinks very much to their advantage by its contractual arrangement which allowed them the privilege of buying their alcoholic beverages outside Mississippi with a specified markup price considered fair by the parties at the time. The fact that these clubs contemplated operation upon government enclaves provided no exemption, and particularly when the government itself had no responsibility therefor.

In James, as State Tax Commissioner of West Virginia v. Dravo Contracting Co., 302 U.S. 134, 58 S.Ct. 208, 218, 82

L.Ed. 155: "In Union P. Railroad Co. v. Peniston, 18 Wall. 5, 33, 36, 21 L.Ed. 787, the Court said: 'It may, therefore, be considered as settled that no constitutional implications prohibit a State tax upon the property of an agent of the government merely because it is the property of such an agent. A contrary doctrine would greatly embarrass the States in the collection of their necessary revenue without any corresponding advantage to the United States.' "

## THE TRANSACTIONS IN SUIT OCCURRED AND THE FUNDS ACCRUED NOT ON ANY ENCLAVE IN MISSISSIPPI, BUT OUTSIDE MISSISSIPPI IN EACH INSTANCE

There is no statute or decision which exempts these bases from these arrangements whereby they purchased these alcoholic beverages in other states from these wholesalers at an agreed markup price to the wholesalers. It was the wholesaler and not the clubs that paid these markup prices to the State Tax Commission in exchange for the right to sell these products in other states for resale in Mississippi.

In Pacific Coast Dairy, Inc. v. Department of Agriculture of California, et al., 318 U.S. 285, 63 S.Ct. 628, 87 L.Ed. 761, the dairy sold milk to the Quartermaster's Department at Moffett Field at less than the minimum price fixed for the area. Congress refused to authorize the Armed Services to refuse bids for milk below the California Milk Stabilization Law price. Moffett Field operated under the exclusive jurisdiction of the government. The exclusive character of jurisdiction at Moffett Field is conceded. The Court said that contracts to sell and sales consummated within the enclave cannot be regulated by California law. The Court observed that on this day in Penn Dairies v. Milk Control Commission, 318 U.S. 261, 63 S.Ct. 617, 87 L.Ed. 748, that a different decision is required where the contract and sales occur within a state's jurisdiction, absent specific national legislation excluding the operation of the state's regulatory laws. The Congress has the power to protect its exclusive jurisdiction on the enclave but not elsewhere unless expressly so provided.

Accordingly, for the reasons stated in the opinion in chief and for the additional reasons stated herein, the complaint in this case is without merit and should be dismissed with prejudice without any assessment of costs.